**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| CHERYL BLAKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WELLS FARGO BANK, N.A., | ) | 1:18CV790 |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

This matter is before the Court on Defendant Wells Fargo Bank, N.A.'s

("Wells Fargo") Motion for Summary Judgment on Plaintiff Cheryl Blake's claims of

race discrimination and hostile work environment.[1] (Mot. for Summ. J. [Doc. #27].)

Wells Fargo argues that Blake's race discrimination claims based on disparate

treatment and conditions of employment are time barred. (Id. ¶ 2.)  Wells Fargo

further argues that Blake's remaining grounds for race discrimination and hostile

work environment fail as a matter of law, because she cannot establish a prima

facie case of race discrimination or prove the elements of hostile work

environment. (Id. ¶¶ 2-5.)  For the reasons explained below, the motion is

GRANTED.

---

[1] In Blake's deposition, she testified that she was terminated in retaliation for pursuing a worker's compensation claim. (Dep. of Blake 75:21-25, 76:1 (July 23, 2019).) However, not only did she not allege this in her Complaint but also she disavowed such a claim in her opposition to summary judgment. (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Br. in Opp'n") [Doc. #32] at 1.)

I.

The following facts are undisputed unless otherwise noted.  On October 14,
2011, Blake, an African-American female, was hired part-time as an Operation
Clerk I at Wells Fargo Bank, located in Raleigh, North Carolina. (Ex. 1A to Decl. of
Andrea Lee (Aug. 19, 2019); Decl. of Lee ¶ 3.)  Blake alleges that when she
applied for the position, the position paid $20.00 per hour, (Compl. at 1), yet while
employed, she was paid at a rate of $9.69 per hour, (Ex. 1A to Dep. of Andrea Lee
(July 24, 2019); Decl. of Lee ¶ 3).  As a part-time employee, Blake was scheduled
to work twenty hours per week, and based on Wells Fargo's paid time off policy,
Blake earned four hours of paid time off. (Decl. of Ramona Davis ¶ 4 (Aug. 19,
2019).)

Blake worked as an Operation Clerk I until June 27, 2014.  (Compl. at 1.)
On June 30, 2014, Blake began working as an Operation Clerk II in the Cash Vault
Services Department in Morrisville, North Carolina at which time Sandra Thomas
was the site manager. (Ex. 1 to Pl.'s Br. in Opp'n; Decl. of Lee ¶ 3; Compl. at 1.)
At least initially, Blake worked part-time twenty hours per week at a pay rate of
$12.58 per hour. (Ex. 1 to Pl.'s Br. in Opp'n.)  In addition to Blake, "there were a
lot" of other part-time African-American employees, including Audra West, who
worked in the Cash Vault Services Department. (Dep. of Blake 25:14-17.)  On

December 20, 2015, Blake began working as a fulltime Operation Clerk II. (Decl. of Lee ¶ 3.)[2]

In the Cash Vault Services Department, an employee's job includes the "handling of cash and currency," and as such, "[i]t was a business need for [team members] to work additional hours because . . . work received . . . by 3:00 p.m. . . . ha[d] to be processed and given credit the same day." (Decl. of Ramona Davis ¶ ¶ 3; Dep. of Ramona Davis 3:23-4:1 (July 24, 2019).) Work was distributed amongst team members evenly "[t]o the best of [Wells Fargo's] ability". (Id. 4:2-4.) Team members "on a regular basis worked more than their scheduled hours as needed but we did not work them at a 40-hour work week", (id. 3:7-9), while "full-time regular employees . . . frequently worked more than 40 hours a week based on line of work and staffing", (id. 3:6-19).

Although Blake was aware that the Operations Clerk II position required overtime work and that Wells Fargo had an overtime policy, (Dep. of Blake 81:13-15, 19, 83:22-23), Blake did not believe that overtime entailed "every day 12 hours a day, 50, 60 hours a week", (id. 81:20-21). Blake testified that Wells Fargo allowed "some [to] go home and ma[d]e me stay" and that "the hours [were] changed any time you felt like it." (Id. 81:22-24.) The reporting times for Blake

---

[2] Blake disputes the fact that she was hired at fulltime or promoted to fulltime during her employment with Wells Fargo. (Pl.'s Br. in Opp'n at 3.) Because Blake merely argues this fact in her response in opposition to summary judgment without an affidavit or other evidence in support, the fact is uncontradicted. (See generally Pl.'s Br. in Opp'n.)

and West changed five or six times, yet Wells Fargo did not "change all the White folks hours like they changed the blacks". (Id. 83:15-19.) Blake also worked overtime with Lisa and Connor,[3] Caucasian co-workers. (Id. 83:3-5.) Blake explained that "[i]t didn't matter who you was. It didn't matter what color you were. It didn't matter what you was hired for. If they needed you as a business need, they could tell you to work extra hours." (Id. 83:25-84:1-4.)

In addition to being aware of the overtime policy, as a Wells Fargo employee, Blake signed a "Team Member Acknowledgement" form, confirming that she had been provided access to Wells Fargo's "Team Member Handbook", including the Code of Ethics and Business Conduct, Risk Management Accountability Policy, and Information Security Policy Overview. (See Ex. 1A, Ex. 1B, Ex. 1C, Ex. 1D to Dep. of Lee; Decl. of Lee ¶¶ 4-5.) By signing the Acknowledgement, Blake agreed that she would read and abide by the policies. (Ex. 1C to Dep. of Lee.).

Included in the Team Member Handbook was a section entitled "Workplace Conduct", which defines "unprofessional and inappropriate team behavior" as including "outbursts", "yelling", "rudeness", "bullying", "distracting behavior during work time (such as being on your electronic or mobile device)", and "conduct that interferes with you or another team member's ability to perform job duties or provide effective customer service". (Ex. 1B to Decl. of Lee.) The

---

[3] Lisa's and Connor's surnames are unclear from the record.

handbook lists the consequences for not abiding by the workplace conduct policy: "[f]ailure to observe all aspects of the policies outlined here, including failure to participate fully and honestly in any investigative or fact-finding process initiated by Wells Fargo, is grounds for corrective action, which may include termination of your employment." (Id.)  Also included in the Team Member Handbook was Wells Fargo's "Speak Up and Nonretaliation Policy", prohibiting "acts of retaliation against a team member who makes a good faith report of improper workplace behavior" while requiring team members to report any retaliatory behavior, including "discrimination, harassment, or other adverse action". (Ex. 1D to Decl. of Lee.)

Despite the policy against unprofessional conduct, Blake testified that unprofessional conduct occurred "all the time" and Wells Fargo "never enforced" the policy. (Dep. of Blake 13:19-22.)  During Blake's employment with Wells Fargo, her "co-workers and managers made 23 complaints to Employee Relations regarding her unprofessional workplace conduct, conflict with others, and safety fears (citing to [Blake's] volatility)." (Decl. of Lee ¶ 11.)  As a result, Blake received (1) a formal warning on January 09, 2013, (2) a final notice on December 20, 2013, (3) an informal warning on June 11, 2015, (4) a formal warning on May 16, 2017. (See Decl. of Lee ¶¶ 12-15; Ex. 1F, Ex. 1G, Ex. 1H, Ex. 1I to Decl. of Lee; Ex. 6-1 to Pl.'s Br. in Opp'n.)

On January 09, 2013, Wells Fargo issued a "formal warning" for

"Workplace Conduct/Professionalism", which included four separate incidents to

support corrective action. (See Ex. 1F to Decl. of Lee.) The warning stated that

> [o]n December 6, 2012, the Work Director approached you to let you know that you could give the remainder of your work to another team member to complete because there was not a business need for you to work past your scheduled hours. You engaged in unprofessional communication by raising your voice loudly toward the Work Director while refusing to do what he requested. When asked by the Work Director why you were raising your voice, your response was to raise your hands and you refused to give the work to another team member. This conduct is disruptive to the workplace, insubordinate and presents an unprofessional work environment.

(Id. at 1.)

The second incident:

> [o]n December 7, 2012, you called the floor phone, talked to a team member and told her that you would not be reporting to work on this day. Protocol states that you need to talk to the Manager or Work Director 30 minutes prior to your report time if you are not going to report to work. The team member handed the phone to the Work Director. The Work Director answered the phone by saying, "This is the Work Director speaking." You responded by saying, "I ain't coming in," and then you hung up. All though you are not required to state a reason for your unscheduled absence, you are required to speak to your manager or work director 30 minutes prior to the beginning of your shift. This was your third unscheduled absence for the year. How you communicated with the work director presents unprofessional communication and you did not follow notification guidelines per the Operations Group Attendance and Punctuality Guidelines and the Wells Fargo Team Member Handbook section on Professionalism, Attendance and Punctuality.

(Id. at 1-2.)

The third incident:

on December 10, 2012, you and I met via the telephone to discuss your previous actions regarding unprofessional communication and your unscheduled absence on 12/07/12. When asked why you hung up on the Work Director you provided no explanation other than the fact that you don't like him. At that time, a copy of the Code of Conduct and Attendance Policy was given to you and discussed. During the Discussion I let you know that you didn't have to like your co-workers but you did have to conduct yourself in a professional manner. You needed to treat each other with respect, come in and do what is expected of you. Outburst directed at the Work Director and creating an uncomfortable environment in the workplace is a violation of the Code of Conduct. Your responses during this discussion were loud. At the end of the discussion your tone had lessened and you stated that you understood the policies and procedures and you would follow them. And upon your return to the department you made a statement by raising your voice and making inappropriate and unprofessional comments to all of the team members on the department floor by saying, "Be careful what you say around here, you don't know who your friends are." This conduct is disruptive to the workplace, and presents an unprofessional work environment to team members.

(Id. at 3.)

The fourth incident:

on January 7, 2013, you and I met via telephone to discuss and review your performance standards for December 2012 and to give you an Informal Warning for not meeting productivity. During the meeting, you stated in a raised voice that the performance stats that were provided were inaccurate. At one point during the feedback session you began to interrupt me and speaking in a raised voice. I asked you to lower your voice and from there, you proceeded to continue speaking in a loud raised voice and banging your hand on the table. You were asked to communicate in a professional manner during the meeting that the meeting would end and continue at another time. Your tone was loud enough for team members on the department floor outside of the conference room to hear you. You were informed that the information was accurate and offered

assistance with resources and coaching to assist you with meeting the productivity standards at a level 3.  You and I continued the meeting and from there, you began to speak in a low voice and your responses were not audible.  You finished the end of the meeting by communicating in a low voice and you were told that I could not hear your responses to the questions leading me to continuously ask if you could hear me and did you understand what I was saying.  Your conduct was unprofessional and disruptive to the workplace.

(Id.)

The warning contained a plan "to correct the situation", which included attaching a copy of Wells Fargo Code of Ethics and Business Conduct Policies and enrollment in communication classes to be completed during work hours. (Id. at 3-4.)  The warning explained that "if this conduct continue[d], [she] may be subject to further corrective action up to and including termination of employment." (Id. at 4.)  The warning noted that Blake refused to sign the document. (Id.)  It appears that Cheryl Roberts, as manager, initialed, and signed Blake's name on January 13, 2012 [sic], [4] writing "refused to sign document". (Id.)  Roberts and a witness also signed the warning on January 11, 2013. (Id.)

On December 20, 2013, Blake was given a "final notice for workplace conduct and insubordinate behavior" by Michael Conder, a manager in Cash Vault Services Department, alleging that she had violated Wells Fargo's workplace

_____

[4] Blake argues in her response in opposition to summary judgment that the date "January 13, 2012" instead of "January 13, 2013" is evidence of Conder's forging her signature. (Pl.'s Br. in Opp'n at 8.)  However, Blake failed to submit admissible evidence to explain the erroneous date. (See generally Pl.'s Br. in Opp'n.)

conduct policy. (See Ex. 1G to Decl. of Lee.) On December 11, 2012, Conder

requested that Blake conclude her "administrative time" and begin her "doc prep,

production responsibility." (Id. at 1.) In response, Blake insisted on completing an

e-mail and calling Conder's manager even after he "offered the opportunity to

complete the task at the end of [her] production day." (Id.) Blake then started

"standing up out of [her] chair and raising [her] voice", and then "moved to the

production floor", and "plac[ing] a call from [her] personal cell phone to [Conder's]

manager." (Id.) The notice warned that future consequences included immediate

termination. (Id. at 2.) On the team member's signature line, it was written "Team

Member refused to sign", and Conder signed the notice as the manager. (Id.)

It was not until June 2015 that Blake received another warning "for

unprofessional behavior violating Wells Fargo's Workplace Conduct Policy." (See

Ex. 1H to Decl. of Lee.) The stated reason for corrective action was based on a

June 9, 2015 incident, when Blake "engaged in verbal argument and made

inappropriate comments to another Wells Fargo team member." (Id. at 1.) Listed

consequences included "further corrective action, up to and including termination

of employment." (Id.) On June 18, 2015, Blake and Conder signed the warning.[5]

(Id. at 2.)

---

[5] In her response in opposition of summary judgment, Blake alleges that Conder
forged her signature on the warning. (Pl.'s Br. in Opp'n at 7.) However, Blake
failed to provide admissible evidence to support the allegation. (See generally id.)

On May 16, 2017, Blake received a "formal warning for unprofessional and inappropriate behavior with a confrontation on the work floor with another team member and . . . continued conduct issues when speaking with management following the conflict with the team member." (Ex. 1I to Decl. of Lee at 1.) The warning stated that future consequences included "further corrective action up to and including termination of employment." (Id.) Conder signed the warning on May 16, 2017. (Id. at 2.) In lieu of a signature, Blake wrote "see below", where she described the incident in her own words:

> Linda [Jones] has been harassing me about things that is none of her business. When telling management they do nothing, Linda yells at Mike and Sandra and other teams members all the time. No corrected action is ever taken on her. I hope that Mike is making two corrective actions. As this is an equal employment opportunity. Mike tends to exaggerate everything. Mike is very unprofessional himself and shows favor to the whites and senior staff. Mike allows the white to yell at him and curse at him on the floor. Whites are shown favor all the time. Check records of whites, and senior staff. I won't talking to Linda, and she asked me if I was talking to her. This is retaliation and will be reported. Mike keeps nothing confidential. Everything that goes on he discusses on the open floor with whites. Linda has poke me with her finger telling me she was running things.

(Id.)

In addition to this statement, during her employment with Wells Fargo, Blake reported various complaints against her co-workers and managers. (Decl. of Lee ¶ 6; Dep. of Davis 1:6, 1:9-11.) Blake complained about bullying, (Dep. of Davis 1:10), "someone not knowing how to talk to people", (id. 1:11), "various co-worker disagreements, such as uneven workload distribution, co-workers bumping

into her, and verbal spats", (Decl. of Lee ¶ 5.), "perceived favoritism, disputes with security, alleged racism, unequal distribution of workloads, failure to apply the attendance policy, unspecified discrimination, falsification of documents, improper time capture, and work sabotage", (id. ¶ 6). Wells Fargo escalated the complaints to Employee Relations, which investigated Blake's complaints, and "depending on the allegations involved, researched the claims presented, conducted interviews where necessary, and followed-up with [Blake] for additional information when needed." (Id.) Davis investigated and addressed these complaints individually with team members and during staff meetings. (Dep. of Davis 1:12-15, 23-25.) As a result, "[t]he resolutions and the feedback centered around coaching and development, setting upfront expectation for professional behavior within workplace . . . ." (Id. 1:18-21.) When Wells Fargo investigated Blake's complaints about paid time off and workload distribution, it was determined that the paid time off policy was not applied discriminatorily, and that the workload was distributed equally. (Decl. of Lee ¶ 9.) Blake was made aware of the findings. (Id.)

Specifically, Blake reported complaints about Conder. Blake believed that Conder was "unfair" to her based on her institutionalization "for an overdose of caffeine" in 1982. (Dep. of Blake 69:2-11.) Blake testified that Conder disclosed her institutionalization to "everybody at Wells Fargo". (Id. 69:25). Blake believed that her co-workers were "playing mind games", (id. 91:13), because they knew about her "background", (id. 91:20-21). For example, Blake recalled one day

having a green bucket and then when she returned there was a different color bucket. (Id. 91:16-19.)

Further, Blake described an interaction with Conder, occurring on June 23, 2016. (Id. 84:11-16; Compl. at 2.)  Blake had a family emergency and informed Conder that she could not work overtime that day. (Id. 84:11-16.)  After informing Conder that she needed to leave once she completed her daily work and upon receiving his permission, Conder "went to the back and brought more work to prevent [her] from leaving." (Id. 84:19-20.)[6]

In addition to reporting complaints about Conder, Blake reported complaints about the working conditions at Wells Fargo.  Blake testified that "[t]here's a whole slew" of examples of how Wells Fargo "discriminated against [her] on [her] race with respect to [her] working conditions." (Id. 42:1-7.)  Blake raised a complaint regarding the security policy on bringing opaque containers into work. (Decl. of Davis ¶ 6.)  The container policy "applied to all associates", (Dep. of Davis 19:12-15), and sometime during Blake's employment, security "did begin to monitor the types of containers that was coming in and out of the operations area", (id. 19:8-9.)  One day when Blake was not allowed to bring an opaque container into work, she "report[ed] to HR about this situation where [she] felt like

---

[6] Blake left Conder a note before leaving work. (Dep. of Blake 84:21.)  The contents of the note and whether she completed her daily work before leaving are not clear from the evidence. (Id. 84:14-25.)

they were harassing [her] about something that Sandra allowed, but Ramona hadn't changed . . . ." (Dep. of Blake 146:17-25.)

Further, when describing the work conditions at Wells Fargo, Blake stated "[b]ecause there was always conflict on the floor, always yelling on the floor by the manager, Sandra Thomas, Gardenia Batts, Carrie Whitt, Linda Jones, but the policies wasn't enforced against them. They – the policy didn't apply to everybody." (Id. 42:12-18.) Blake describes Batts, an African-American manager, as yelling "[a]ll the time" and that she would "sometimes" yell "at everyone else." (Id. 45:1-4, 17-19.) Batts would yell about "[g]etting off the clock." (Id. 45:7.) On one occasion, Batts was yelling and "specifically talking to [Blake]" that she needed to "[g]et it done." (Id. 45:7-10.) Whitt also was "always yelling about . . . [a]nything and everything that she could", (id. 50:4-7), and would yell at Thomas, also, (id. 50:25).

Thomas, an African-American manager, (id. 46:11-12), would yell at Blake and "generally yell at other people as well", (id. 45:20-23). Thomas would yell at Blake because she was "the last one there". (Id. 46:2-4.) Blake believed that she was "the last one there", because "they" were giving her "the White folk's work that they . . . had left. And [Blake] didn't know it at the time." (Id. 46:4-6.) Blake believed that they were sabotaging her work. (Id. 46:7-9.)

Blake worked with Jones, an African-American trainer without a supervisory role, (id. 46:13-19, 47:17), "on a daily basis", (id. 46:20-22), and had "some

conflicts" with Jones, (id. 46:23, 47:1).  Blake describes Jones and Rhonda[7], a Caucasian co-worker, (id. 47:3-4), as being bullies and "harass[ing] people", (id. 48:15-18).  Jones and Rhonda would "overhear conversation on the floor, they always commented on it between the two of them, which would cause conflict . . . ." (Id. 47:3-7.)  Jones and Rhonda would comment about other co-workers, including Lisa, also. (Id. 48:19-23.)  Blake describes another incident occurring between Jones, Rhonda, and her when Rhonda and Jones were "convers[ing] back and forth about stuff that took place . . . [and] Rhonda was good for making these little snide comments or comments about different people." (Id. 129:1-23.)

Blake also alleges that "Well Fargo caused [her] mental distress." (Id. 125:1-3.)  Blake cites to other "scenarios" that she provided during her deposition. (Id. 125:4-7.)  Blake describes the conflict with Heather Burns as "emotional" and "stressful". (Id. 125:11-13.)  In February 2018, Blake "raised allegations to HR Advisor . . . that she felt 'retaliated against' by her peer, Heather Burns." (Ex. 1D to Decl. of Lee.)  Burns accused Blake of "standing and blocking her movement and it never happened", (id. 125:14-16), and Thomas "had to view the cameras to say that it didn't happen", (id. 125:14-16, 18-19).  Upon examining the surveillance videos, it was seen that Davis coached Burns on professional conduct in the workplace. (Decl. of Lee ¶ 8.)  Burns was placed on corrective action, (id. ¶

---

[7] Rhonda's surname is unclear from the record.

8), and Thomas provided Blake with the policy on Wells Fargo's workplace conduct, (id. 125:24-25).

After an investigation into previous allegations made by Blake, corrective action, and an "intake discussion" with Blake, Blake remained "upset" and complained that "Burns is not held equally accountable for her workplace disruptions because she is white and privileged". (Ex. 1D to Decl. of Lee.)  Blake further complained that "she [was] mistreated due to her race". (Id.)  Wells Fargo did not "conduct a formal fact finding", because it "[found] it unnecessary". (Id.)  On February 23, 2018, Blake indicated that Burns' "behavior had improved." (Decl. of Lee ¶ 8.)

On April 25, 2018, Wells Fargo terminated Blake's employment, (Decl. of Davis ¶ 6.), as an Operation Clerk II in the Cash Vault Services Department. (Dep. of Blake 25:18-25.)  Blake "was terminated because she had been placed on corrective action several times for unprofessional conduct and then [Blake] admitted that on March 29, 2018, that she used profanity that was directed towards a workers' compensation adjuster", which "did violate [Wells Fargo's] professionalism policies . . . ." (Dep. of Lee 5:2-9.)  Blake disputes that when she was interviewed on April 4, 2018, "she admitted that she told the adjust[e]r [sic] to 'fuck off' and 'hang up the fucking phone.'" (Decl. of Lee ¶ 16.)

Davis and Paul Romero telephoned Blake and informed her of her termination. (Dep. of Blake 95:7-10.)  Davis informed Blake that she was being "terminated immediately for the incident with Sedgwick . . . worker's comp

insurance company - - provider . . . ." (Id. 95:13-15.)  Davis informed Blake that

the decision to terminate her "had already been through HR". (Id. 95:19-20.)  In

response, Blake said "[w]ell, you made a lot of people happy", because she "really

felt that they were conspiring against [her]." (Id. 95:22-24.)  Upon review of

Blake's termination, Lee investigated Blake's allegations and examples of profanity

being used in the Cash Vault Services Department. (Dep. of Lee 8:15-19, 8:21-

24.)  Lee learned that "profanity has been used in the cash vault", (id. 9:15-25),

by team members and managers, but the profanity was "never directed at

someone nor was it a repeat occurrence", (id. 9:1-4).

Blake agrees that "it is unacceptable to curse or use profane language

towards . . . directed at a someone else in the workplace." (Dep. of Blake 13:2-8.)

Blake does not believe it is inappropriate to use profanity when it is not directed

towards anyone. (Id. 12:21-24.)  Blake denied ever threatening anyone in the

workplace. (Id. 95:4-6.)  Blake also denied talking to a manager or telling the

insurance adjuster to "fuck off", (id. 77:1-9), yet Blake admitted saying "fucking

phone", (id. 77:2), while on the phone with . . . an insurance adjuster, (id. 77:9-

10).

During her employment, Blake filed a Charge of Discrimination based on race

discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Ex.

1E to Decl. of Lee at 1-2.)  On May 14, 2018, the EEOC closed the file, notifying

Blake of her right to sue. (Id. at 5.)  On September 10, 2018, Blake filed a second

EEOC Charge of Discrimination. (Id. at 3-4.)  On September 18, 2018, the EEOC

closed the file, notifying Blake of her right to sue. (Id. at 6.)

II.
A.

"Summary judgment is appropriate when, viewing the facts in the light most

favorable to the nonmoving party, 'there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law,' Fed. R. Civ. P.

56(a)." Groves v. Commc'n Workers of Am., 815 F.3d 177, 181 (4th Cir. 2016).

The moving party bears the initial burden of establishing "the basis for its motion[]

and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which

it believes demonstrate the absence of a genuine issue of material fact." Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)[8]).  The

"mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A dispute is genuine if a reasonable

jury, based on the evidence, could find in favor of the non-moving party. Id. at

248.  The materiality of a fact depends on whether the existence of the fact could

cause a jury to reach different outcomes. Id.  The court cannot weigh the

evidence, by failing to credit contradictory evidence, or make credibility

---

[8] Rule 56(c) was amended effective December 1, 2010, but the substance of the
rule did not change.

determinations. <u>Variety Stores, Inc. v. Wal-Mart Stores, Inc.</u>, 888 F.3d 651, 659-60 (4th Cir. 2018).

In determining whether a genuine dispute of material fact exists, the court "regards the non-movant's statements as true" and "accepts all admissible evidence" by the non-movant. <u>Adefila v. Select Specialty Hosp.</u>, 28 F. Supp. 3d 517, 522 (M.D.N.C. 2014) (citing to <u>Anderson</u>, 477 U.S. 242 at 255). However, the non-movant must provide more than a "mere existence of a scintilla of evidence" to support her claim. <u>Anderson</u>, 477 U.S. 242 at 251. The movant "must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). When a non-movant does not cite to specific materials, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. (56)(c)(3).

B.

Because Blake is not represented by counsel, her filings are liberally construed.[9]  <u>See</u> <u>Reid v. Charlotte-Mecklenburg Bd. of Educ.</u>, No. 3:14CV00066,

---

[9] In her response in opposition to summary judgment, Blake contends that she was unable to retrieve all discovery from Wells Fargo or depose Thomas and "other key witnesses". (Pl.'s Br. in Opp'n at 2.)  Blake's discovery claims were addressed by

2016 WL 6080545, *3 (W.D.N.C. 2016) (unreported); see also Sinclair v. Mobile

360 Inc., 417 F. App'x. 235, 243 (4th Cir. 2011). However, "[t]he wide latitude

given pro se litigants must be balanced with the responsibility of the Court to

refrain from advocating for a particular party." Reid, No. 3:14CV00066, 2016 WL

6080545, at *3. "A pro se plaintiff must comply with Rule 56 of Federal Rules of

Civil Procedure and come forward with sufficient evidence upon which a

reasonable jury could return a verdict in his or her favor". Id. at *4. Under the

Federal Rules of Civil Procedure, a plaintiff may cite to "particular parts of materials

in the record" to support her arguments. Hill v. Equifax Info. Servs., LLC., 974 F.

Supp. 2d 865, 868 (M.D.N.C. 2013) (citing to Fed. R. Civ. P. 56(c)(1)(A)).

However, if "the material cited to support or dispute a fact cannot be presented in

a form that would be admissible in evidence", then her "reliance on that material

may be defeated." Id. at 868-69 (explaining that the court liberally construed the

pro se plaintiff's "verified pleadings" and affidavit; "[h]owever, where [p]laintiff

ha[d] presented no evidence, or even an inference, of the ability to present

evidence in admissible form, those facts [could not] be considered in opposition to

_____

Judge Webster's Text Orders on May 2, 2019 and November 19, 2019. (See
Docket for Text Orders from May 2, 2019 and November 19, 2019.) Further,
because the extended discovery period closed on July 29, 2019, and Blake failed
to notify the Court in an appropriate and timely motion, (see generally Docket), her
arguments are not properly before the Court. See Evans v. Techs. Applications &
Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996) (stating that "while courts generally
are concerned about granting summary judgment when the opposing party has not
had a fair opportunity to discover essential information, they reasonably expect
notification and explanation when more time for discovery is needed.").

[d]efendant's motion for summary judgment") (citing to <u>Whittaker v. Morgan State Univ.</u>, 524 F. App'x. 58, 60 (4th Cir. 2013)).

Here, after Wells Fargo filed its Motion for Summary Judgment, the only evidence Blake submitted was her unsworn response and several exhibits, which included her handwritten notes, conclusions, and allegations. (<u>See generally</u> Pl.'s Br. in Opp'n); <u>see also</u> <u>Reid</u>, No. 3:14CV00066, 2016 WL 6080545, at *6 (citing to <u>Causey v. Balog</u>, 162 F.3d 795, 802 (4th Cir. 1998) (holding that conclusory statements, without specific evidentiary support, are insufficient to defeat a motion for summary judgment)).

Wells Fargo argues that Blake's failure to comply with Local Rule 56.1(e) and Federal Rule of Civil Procedure 56(e) equates to an uncontested motion for summary judgment, warranting summary judgment for Wells Fargo. (Def.'s Resp. in Supp. of Def.'s Mot. for Summ. J. [Doc. #33] at 2.) Local Rule of Civil Procedure 56.1(e) requires the non-moving party to establish the elements of her claim and cite to supporting authority. L.R. Civ. P. 56.1(e). However, even if Wells Fargo's motion were deemed uncontested, "[a]n uncontested motion for summary judgment is not automatically granted." <u>Sosa v. Advance Auto Parts</u>, No. 1:03CV00587, 2004 WL 953508, *4 (M.D.N.C. 2004) (citing <u>Campbell v. Hewitt, Coleman & Assocs., Inc.</u>, 21 F.3d 52, 55 (4th Cir. 1994); <u>Custer v. Pan Am. Life Ins. Co.</u>, 12 F.3d 410, 416 (4th Cir. 1993)). Thus, Wells Fargo "must still show that the facts entitle [it] to judgment as a matter of law." <u>Id.</u>

C.

Blake asserts claims for race discrimination and hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). 42 U.S.C. § 2000e-2(a)(1).  Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge an individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . " § 2000e-2(a)(1).  Here, Blake alleges that (1) during her employment as Operation Clerk I, she was "paid at a different rate in the same position" than Caucasian co-workers, (Compl. at 1), (2) "as a black employee [she] was required to work mandatory over time", (id.), (3) Caucasian workers "were paid 5 hours or more when out on PTO holiday", (id.), (4) "[b]usiness needs for overtime did not apply to part time whites and or all regular time whites", (id. at 2), and (5) harassment based on work sabotage, (id.), and actions taken by her co-workers and managers, (id. at 3).

Wells Fargo first argues that Blake's race discrimination claim based on unequal pay as Operation Clerk I is time barred.  To pursue a Title VII claim, a plaintiff has up to 180 days after the alleged unlawful employment practice to file an EEOC charge.  See 42 U.S.C. § 2000e-5(e)(1).  Blake alleges that she received unequal pay based on her race from 2011 to 2014, but she did not file her first EEOC charge until April 22, 2017, which is well beyond the 180 days to timely file.

When an employee is asserting complaints about non-discrete acts, occurring before the 180 days, the continuing violation theory may apply. See Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007). Under the continuing violation theory, a plaintiff may pursue "incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination. See id. at 219-20. Even when considering the continuing violation theory, any allegation of discrimination based upon unequal pay is time barred, because the conduct concluded in 2014, when she was hired as an Operation Clerk II.[10]

Wells Fargo further argues that Blake's claim for race discrimination based on unequal paid time off is barred. Blake alleges that Caucasian co-workers received five hours of paid time off while she received four hours. Blake asserts without providing admissible evidence that she remained part time throughout her employment with Wells Fargo; however, Wells Fargo provided uncontradicted evidence, indicating that Blake became fulltime on December 20, 2015. Once Blake became a fulltime employee, the part-time paid time off policy no longer applied to her. As such, her claim based on unequal paid time off is barred to the extent the allegation relies on the time period between October 14, 2011 and December 20, 2015, more than a year prior to the April 22, 2017 EEOC charge.

---

[10] Blake does not allege or provide evidence of unequal pay in her position as Operation Clerk II. (See generally Compl.; see also Pl.'s Br. in Opp'n.)

Next, Wells Fargo contends that it did not discriminate against Blake on the basis of her race when it required her to work overtime. To establish a claim for race discrimination, a plaintiff has two avenues. A person may establish a claim for race discrimination by providing direct evidence of intentional discrimination or circumstantial evidence. See Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988). A plaintiff bears the burden of producing direct or circumstantial evidence "of sufficient probative force to reflect a genuine issue of material fact." Id. at 848. Blake did not proffer any direct evidence of race discrimination; therefore, under the second avenue of proving race discrimination, she has the burden of creating a prima facie case under the McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Under McDonnell Douglas, Ms. Blake may establish a prima facie case of race discrimination by showing (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse employment action, she was performing at a level to meet Wells Fargo's expectations; and (4) Wells Fargo treated a similarly situated individual outside of her protected class more favorably. See id.; see also E.E.O.C. v. Sears Roebuck & Co., 243 F.3d 846, 851 n.2 (4th Cir. 2001) (referencing McDonnell Douglas Corp., 411 U.S. at 802 n. 13 to highlight the flexibility of the McDonnell Douglas framework when applying it to different circumstances).

The sole remaining discrimination claim is Blake's allegation of mandatory overtime based on her race. Wells Fargo argues that Blake cannot make a prima facie case and has failed to provide evidentiary support for her claim.

Blake satisfies the first element as she is African-American, thus, a member of a protected class.

Blake's claim fails on the second element, because she cannot prove that she suffered an adverse employment action.[11] An employer takes an adverse employment action against an employee when "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Wagstaff v. City of Durham, 233 F. Supp. 2d 739, 744 (M.D.N.C. 2002) (citing Burlington Indust., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). Although "[a]n employment action . . . need not be 'ultimate; to be 'adverse'", the action must "'result[] in an adverse effect on the terms, conditions, or benefits of employment.'" Westbrook v. N.C. A&T State Univ., 51 F. Supp. 3d 612, 619 (M.D.N.C. 2014) (citations omitted). Here, Blake alleges that Wells Fargo's act of requiring her to work overtime due to her race is an adverse employment action. However, Blake failed to proffer evidence of how the act adversely affected her terms, conditions, or benefits of employment. Neither the record indicates nor

---

[11] Although Blake was ultimately terminated from Wells Fargo, Blake does not allege that her termination was an adverse employment action. (See generally Compl.) Instead, her filings indicate that her termination was a result of alleged retaliatory action. (See generally Compl.; see also Pl.'s Br. in Opp'n.)

does Blake allege that she was not compensated for working overtime. Because Blake was paid to work overtime, which benefitted her, she failed to prove that she suffered an adverse employment action. See Newbill v. Washington Gas Light Co., 375 F. App'x. 329, 330 (4th Cir. 2010) (holding that the employee failed to establish a prima facie case of discrimination, because not only did the employee fail to produce "evidence of any adverse employment action" but also the record showed that the employee's "salary and overtime pay increased steadily . . . and [was] commensurate with his fellow Caucasian workers"). As such, Blake's claim for race discrimination based on overtime pay fails as a matter of law. See Tom v. Nw. Airlines, Inc., 229 F.3d 1144 (unreported table) (4th Cir. 2000) (explaining that "[w]hen there is a complete failure of proof by the nonmovant on one of the elements of the cause of action, all other material questions of fact are necessarily rendered immaterial") (citing to Celotex Corp., 477 U.S. at 323 (1986)).

Even if Blake could prove that Wells Fargo took an adverse action against her, when viewing the facts in the light most favorable to her, she has failed to create a genuine issue of fact that she was performing her job satisfactorily at the time of the alleged adverse action. While Blake asserts arguments in her response brief, she failed to present admissible evidence to show that she was meeting Wells Fargo's legitimate expectations. Sosa, No. 1:03CV00587, 2004 WL 953508, at *5 (granting employer's summary judgment motion, because the plaintiff "ha[d] not put forth any evidence, in the way of performance reviews or

other documentation, that he was performing satisfactory when he was terminated").

Instead of providing evidence of her meeting Wells Fargo's legitimate expectations, Blake provided documentation of her alleged misconduct, including her written, inadmissible conclusions and allegations. Blake's evidence in addition to Wells Fargo's evidence documenting her alleged misconduct made Blake aware that Wells Fargo had issues with her job performance. Even when considering Blake's written notes in conjunction with her statements when she refused to sign the warnings, Blake never denied the actions described within the warnings and even admits by testimony that she used profanity with the insurance adjuster. As such, Ms. Blake has failed to contradict Wells Fargo's declarations and depositions, highlighting her performance issues. See Adefila, 28 F. Supp. 3d at 523-24 (finding that "because undisputed evidence show[ed] [the plaintiff's] job performance was not satisfactory" and plaintiff's reasons for failing to follow protocol did not "contradict the myriad other performance issues referred to in the declarations submitted by [defendant]", plaintiff's prima facie case failed). As such, summary judgment is granted on Blake's claim for race discrimination.

## D.

Additionally, as a part of her claim of race discrimination, Blake argues that Wells Fargo subjected her to harassment and a hostile work environment. "A violation of Title VII occurs when an employee's 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Pryor v. United Air Lines, Inc.</u>, 791 F.3d 488, 496 (4th Cir. 2019) (citing to <u>Harris Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)). To establish a hostile work environment claim, Ms. Blake must show that she (1) "experienced unwelcome harassment", (2) "the harassment was based on race or color", (3) "harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive atmosphere", and (4) "there is some basis for imposing liability on the employer". <u>Westbrook</u>, 51 F. Supp. 3d at 620-21 (citing <u>Baqir v. Principi</u>, 434 F.3d 733, 745-46 (4th Cir. 2006); <u>Bass v. E.I. DuPont de Nemours & Co.</u>, 324 F.3d 761, 765 (4th Cir. 2003)).

Blake alleges that she experienced harassment from her co-workers and managers. "The first element of a hostile environment claim, unwelcome conduct, is not a high hurdle." <u>Strothers v. City of Laurel, Md.</u>, 895 F.3d 317, 328 (4th Cir. 2018). An employee can establish this element "simply by voicing her objection to the alleged harasser or to the employer." <u>Id.</u> at 328-29 (providing a sample of cases).

Blake specifically alleges that (1) her workload was sabotaged by Caucasian workers when their work was given to her, (2) her managers yelled at her because she was the last employee to leave and she worked overtime, (3) on March 16, 2017, three or four more buckets of work were added to her workload, (4) Burns falsely accused her of blocking the walkway, (4) Conder gave her more work when she requested to leave for a family emergency, (5) Jones and Rhonda acted like

bullies when they talked about her, and (6) she was no longer permitted to bring an opaque container into work. When questioned about which conduct she considered unwelcome, Ms. Blake testified that she experienced the following behavior: (1) her work was sabotaged when she was given additional work, (2) Batts, Thomas, and Jones, as managers, yelled at her, (3) her buckets were changed due to Conder disclosing her history of institutionalization, (4) on one occasion, Conder gave her additional work after she allegedly received permission to leave work, (5) Jones and Rhonda acted like "bullies" towards her when they "talked" about her, 6) security prevented her from using an opaque container, and 7) Burns' falsely accusing her of blocking the walkway. Wells Fargo provided evidence that Ms. Blake reported her concerns, including complaints about bullying, workload distribution, security's cup enforcement, and work sabotage. This evidence is sufficient to establish element one. Id. at 329 (explaining that "[t]he alleged conduct need not be severe, as severity is better addressed under the third element, pervasiveness").

Blake has failed to proffer any evidence that the unwelcomed conduct was based on her race or color.[12] "To establish that harassment was based on race, [Blake] 'must show that "but for" [her] race . . . , [she] would not have been the victim of the alleged discrimination." Gilliam v. S.C. Dep't of Juvenile Justice, 474

_____

[12] Blake also alleges harassment based on her co-workers' and Conder's having knowledge of her previous institutionalization, which is not a ground for a hostile work environment claim under Title VII.

F.3d 134, 142 (4th Cir. 2007) (citing <u>Causey v. Balog</u>, 162 F.3d 795, 801 (4th Cir. 1998)); <u>see also</u> <u>Hawkins v. PepsiCo, Inc.</u>, 203 F.3d 274, 281 (4th Cir. 2000) (concluding that personal disputes with a supervisor, without evidence that harassment was "racial in nature", were not enough to sustain summary judgment on a hostile work environment claim).

Blake generally alleges that she was harassed by Caucasian co-workers and managers. The record reveals that Blake had disputes with her Caucasian co-workers and managers. However, Blake fails to show that her race was the "but for" cause for the disputes. Blake testified that Jones, a Caucasian manager, and Batts and Thomas, African-American managers, yelled at all co-workers, not just her. Even though Blake argues that Burn's false allegation and Rhonda's and Jones's "talking about" her were evidence of harassment, Blake failed to prove her co-workers' actions were based upon race. In fact, Blake's own testimony revealed that Rhonda, a Caucasian co-worker, and Jones, an African-American non-supervisory trainer, "talked about" her and other co-workers, including Lisa, a Caucasian co-worker.

Blake further alleges that she was given extra work, because she was the only African-American worker. However, Blake's deposition contradicts her own allegation. Blake testified that "there were a lot" of other African-American co-workers like West, who worked in the Cash Vault Services Department with her, and that despite an employee's race, all employees had "to work extra hours" if Wells Fargo needed them. Not only were other Caucasian co-workers required to

work overtime but also Blake was aware of Wells Fargo's policy, requiring all employees to work overtime per business need. Blake's final allegation regards Wells Fargo's policy against opaque containers. Wells Fargo adduced evidence that the policy applied to all employees. Blake did not testify that she was not allowed to bring an opaque cup into work due to her race but instead that a change in management led to the enforcement of the policy. Thus, Blake failed to show that any unwelcomed conduct was based on her race.

In addition, Ms. Blake has failed to show that any alleged harassment was sufficiently severe or pervasive. Blake must show that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." Harris, 510 U.S. at 22. To determine whether an environment is reasonably perceived as hostile or abusive, the "totality of the circumstances" is considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening of humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001) (citing Harris, 510 U.S. at 23).

The isolated incidents of office gossip, employee trickery, and enforcement of policies that Ms. Blake experienced do not amount to severe and pervasive harassment. See Westbrook, 51 F. Supp. 3d at 622 (explaining that "[i]solated comments from co-workers and [manager's] actions regarding Plaintiff's vacation request, does not amount to the severe and pervasive conduct necessary to establish a claim"); see also Murry v. Jacobs Techn., Inc., No. 1:10CV771, 2012

WL 1145938, *15 (M.D.N.C. 2012) (providing examples of when the Fourth Circuit has found a work environment to be hostile and abusive) (citing Spriggs, 242 F.3d at 185 (describing supervisor's "incessant" use of repugnant terms including "n-----," "monkey," and "black bitch," which caused plaintiff to complain "several times" to his supervisors); E.E.O.C. v. Cent. Wholesalers, Inc., 573 F.3d 167, 176 (4th Cir. 2009) (finding that a reasonable jury could find that the race-based harassment was objectively severe or pervasive where "co-workers used the n * * * *r . . . on a regular basis, and at least one co-worker used the word 'pretty much every day,' "another co-worker called plaintiff "a black stupid n * * * r , [and two other coworkers] kept blue-colored mop-head dolls in their offices and had the dolls handing from nooses which were tied around the dolls' necks")).

Even if Blake could prove that she suffered severe and pervasive harassment based on her race, she failed to show a basis for imposing liability on Wells Fargo. "An employer is liable for harassment by the victim's coworkers only 'if it knew or should have known about the harassment and failed to take effective action to stop it.'" E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 319 (4th Cir. 2008) (citing Howard v. Winter, 446 F.3d 559, 565 (4th Cir. 2006) (quoting Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003)); see also Freeman v. Dal-Tile Corp., 750 F.3d 413, 423 (4th Cir. 2014) (explaining that "an employer is liable under Title VII for third parties creating a hostile work environment if the employer knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end the harassment'") (citations omitted).

Blake alleges mental distress in reference to the false accusation by Burns and, in her response in opposition to summary judgment, charges negligence on the part of managers for failing to discipline other co-workers after she filed complaints against them. Blake failed to provide evidence that Wells Fargo did not investigate her complaints while the uncontradicted evidence shows that Wells Fargo promptly investigated her complaints, including the complaint against Burns, and issued corrective action. As such, summary judgment as to Blake's hostile environment and harassment claim is granted.

III.

For the reasons explained in this Memorandum Opinion, IT IS HEREBY ORDERED that Defendant Wells Fargo Bank N.A.'s Motion for Summary Judgment [Doc. #27] is GRANTED.

This the 24th day of January, 2020.

/s/ N. Carlton Tilley, Jr.<br>Senior United States District Judge